UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------- x

UNITED STATES OF AMERICA,                   :
                                            :        20-cr-346 (JSR)
              -v-                           :
                                            :
OWEN WATSON,                                :        MEMORANDUM
                                            :
              Defendant.                    :
----------------------------------- x

JED S. RAKOFF, U.S.D.J.

　　　Defendant Owen Watson, who is charged in a single-count indictment with possession of a firearm by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 2, moves for suppression of physical evidence seized and statements obtained from him during the encounter with the police that led to his arrest. Dkt. No. 15. In a bottom-line order dated January 26, 2021, the Court denied the motion. Dkt. No. 20. This Memorandum explains the reasons for that ruling.

## **Background**

　　　The basic facts, which are set forth in Watson's declaration, the uncontested parts of the Government's complaint, and the body camera footage that the Court viewed, are largely undisputed for the purposes of this motion.

　　　On May 7, 2020, at 2:45 p.m., Watson was leaving a convenience store in the Bronx. In one hand, he held an unlit cigar containing marijuana; in the other, he held a clear, plastic, disposable drink

cup with a straw. Around his waist, he wore an "opaque, bright blue fanny pack with a red zipper," containing a ".40 caliber firearm." Declaration of Owen Watson ("Watson Decl."), Dkt. No. 16, ¶¶ 3, 4.

Driving past Watson in an unmarked van were three police officers from the New York City Police Department. Complaint ("Compl."), Dkt. No. 1, ¶ 5(a). From the van, the officers observed Watson holding what they believed was a marijuana cigar. Id. ¶ 5(b). The van came to a stop outside the convenience store. Watson Decl. ¶ 4. The officers, who were clearly identifiable as law enforcement, exited the van, approached Watson, and told him to "stop." Id. Watson complied and put his hands up. Id.

The officers "surrounded" Watson and began to question him. Id. ¶ 7. They "observed a heavy-looking L-shaped object" in Watson's fanny pack, which they suspected was a firearm. Compl. ¶ 5(b). One of the officers reached to feel the fanny pack, and believed that he felt a firearm. Id. ¶ 5(d). After Watson took a step back, the other officers grabbed him and placed him under arrest. Watson Decl. ¶ 7. One of the officers removed the fanny pack from Watson's waist and removed the gun. Id.

On July 9, 2020, Watson was charged in a single-count indictment with possession of a firearm by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 2. Dkt. No. 7.

On September 30, 2020, he filed the instant motion, claiming that the firearm was seized in violation of the Fourth Amendment. Dkt. No. 15.[1] In the Government's response, it represented that it did not believe an evidentiary hearing was necessary because "every fact necessary to decide this motion is clear." Gov. Mem. at 2 n.1. After reviewing the papers, however, the Court determined that it would be appropriate to hold an evidentiary hearing and did so on January 22, 2021. The Court's findings of fact, which fill in the gaps to the basic story set out above, are set forth below.

## **Discussion**

Watson argues that his Fourth Amendment rights were violated in four ways. He contends: (1) that the officers lacked reasonable suspicion to initially stop him; (2) that, even if the officers had reasonable suspicion to stop him, they lacked probable cause to execute what was a de facto arrest; (3) that the officers lacked reasonable suspicion to frisk him; and (4) that, even if they had reasonable suspicion to frisk him, the officers were not permitted

---

[1]   Watson also moves to suppress any and all statements elicited from him by law enforcement on the day of the arrest. The Government represents, however, that it does "not intend to introduce any statements he made during that time at trial." Memorandum of Law of the United States of America in Opposition to Defendant Owen Watson's Motion to Suppress ("Gov. Mem."), Dkt. No. 18, at 2. That prong of Watson's motion is therefore denied as moot.

to search the fanny pack absent a warrant. Affirmation of Patrick Joyce, Esq. ("Joyce Affirm."), Dkt. No. 17. The Government responds that the marijuana cigar gave the officers reasonable suspicion to stop Watson; that the initial stop did not amount to a de facto arrest; that the "L-shaped bulge" in Watson's fanny pack gave the officers reasonable suspicion to frisk him; and that the officers were permitted to search the fanny pack pursuant to the plain feel doctrine. Gov. Mem. 8-15.[2]

I.   **Whether the Officers had Reasonable Suspicion to Stop and Frisk Watson**

The stop-and-frisk regime is governed by a two-step analysis laid out in Terry v. Ohio, 392 U.S. 1 (1968).[3] The first prong governs the propriety of the initial investigatory seizure and the second prong governs the propriety of any subsequent frisk. Under the first prong, an officer may stop an individual if she has "reasonable suspicion" to believe that criminal activity has

---

[2]   The Government also argues that the seizure of the firearm complied with the Fourth Amendment because the marijuana cigar gave the officers probable cause to arrest Watson and to conduct a search incident to that arrest. Gov. Mem. 4-7. Because, for the reasons discussed below, the Government's "reasonable suspicion" theory resolves the motion in the Government's favor, the Court does not address the Government's "probable cause" theory of the interaction.

[3]   Unless otherwise indicated, in quoting cases all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

occurred or is about to occur. Id. at 30-31. Under the second prong, an officer may frisk a lawfully stopped individual if she has reasonable suspicion that the person "is armed and presently dangerous to the officer or to others." Id. at 24. These analyses are distinct; the satisfaction of one prong cannot serve as justification for the other. Cf. Arizona v. Johnson, 555 U.S. 323, 326 (2009) (setting forth the two-step analysis).

## A. Whether the Officers had Reasonable Suspicion to Stop Watson

The Court "must determine first when Watson was stopped, and hence 'seized' for purposes of the Fourth Amendment, and second whether reasonable suspicion existed at that point." Dancy v. McGinley, 843 F.3d 93, 109 (2d Cir. 2016).

### 1. When was Watson Stopped for Fourth Amendment Purposes?

Not every interaction with law enforcement triggers Terry's two-step regime. Cf. United States v. Tehrani, 49 F.3d 54, 58 (2d Cir. 1995) (distinguishing between consensual encounters and Terry stops). A Terry stop, or a "seizure," occurs only when, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 554 (1980). "Circumstances that might indicate a seizure include the threatening presence of several officers, the display of a weapon by an officer, some

-5-

physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Simon v. City of New York, 893 F.3d 83, 99 (2d Cir. 2018). This "reasonable person standard presupposes an innocent person." United States v. Springer, 946 F.2d 1012, 1017 (2d Cir. 1991).

Watson suggests that he was seized from the moment the "officers screeched to a stop in front of [him]." Watson Decl. ¶ 9. The Court disagrees. At that point, the officers had not yet addressed Watson, let alone ordered him to comply with any request. Indeed, since Watson had no way of knowing then whether the officers even intended to speak with him, a reasonable person would not have believed that he was not free to leave.

Instead, the Court holds that Watson was seized when the officers directed him to "stop." A reasonable, innocent person in Watson's position would not believe that he was free to disregard the order of three approaching uniformed police officers. Indeed, a reasonable person would believe that "compliance with [the officers'] request[] [was] required." Florida v. Bostick, 501 U.S. 429, 435 (1991).[4]

---

[4]    Watson suggests that the Court should apply a more granular test and ask whether "a reasonable and cognizant, young Black man in 2020" would believe that he was free to go. See Joyce Affirm.

### 2. Whether Reasonable Suspicion Existed When the Officers Seized Watson

The Court must determine whether -- at the moment the officers directed Watson to "stop" -- they had reasonable suspicion that Watson either had committed a crime or was about to do so. Reasonable suspicion to make a stop under the first Terry prong "requires more than a hunch. Rather, it demands specific and articulable facts which, taken together with rational inferences from those facts, provide detaining officers with a particularized and objective basis for suspecting wrongdoing." United States v. Bailey, 743 F.3d 322, 332 (2d Cir. 2014). While the "standard is not high," id. -- indeed, it requires "considerably less than proof of wrongdoing by a preponderance of the evidence," Navarette v. California, 572 U.S. 393, 397 (2014) -- a court still "cannot merely defer to police officers' judgment in assessing reasonable suspicion, [but rather] must view the totality of the circumstances through the eyes of a reasonable and cautious police officer on the scene." Bailey, 743 F.3d at 332.

The Government contends that the officers had reasonable suspicion to stop Watson for possession of marijuana in violation of New York Penal Law § 221.05. Because possession of marijuana is

---

¶ 9. Even assuming arguendo that Watson's proposed standard complied with Mendenhall, the Court's conclusion regarding when Watson was seized would not change.

illegal in the State of New York, reasonable suspicion of marijuana possession can form the basis of a valid stop. See, e.g., United States v. Bignon, 813 Fed. App'x 34, 35-36 (2d Cir. 2020).

Watson does not dispute that possession of marijuana could in theory provide a basis for a Terry stop. Instead, Watson contends that the officers did not have reasonable suspicion that Watson possessed marijuana at the moment the officers initiated the Terry stop. He attempts to distinguish Bignon. In that case, the Second Circuit held that an officer had probable cause (and, a fortiori, reasonable suspicion) for believing the defendant's cigar contained marijuana. It explained that

> [g]iving due weight to [the officer's] extensive history of enforcing New York's marijuana laws, a reasonably prudent person could believe that [the defendant] was smoking marijuana based on [1] the color and nature of the smoke, [2] the distinctive way in which [the defendant] was holding the cigarette, [3] the odor of marijuana in the air, and [4] [the defendant's] reaction to the officers' approach (i.e., discarding his cigarette and walking in the opposite direction).

Id. at 37. Here, by contrast, Watson argues, his cigar was unlit and therefore emitted "no smoke or smell," there is no evidence that the officers observed Watson holding the cigar in any "distinctive way," and Watson's response to the officers' approach was one of compliance not evasion. See Memorandum of Law in Reply to the Government's Motion to in [sic] Opposition to Defendant Owen Watson's Motion to Suppress ("Reply"), Dkt. No. 19, at 3.

Watson argues, in other words, that the officers lacked "articulable facts . . . show[ing] the cigar in Watson's hand contained marijuana." Id.

This inquiry is muddled by the fact that the initial record before the Court was not dispositive as to where, exactly, the officers were -- and thus what, precisely, they observed -- when they directed Watson to stop. The bare-boned Complaint is of little use. It alleges that, as the officers drove by in their van, they "observed [Watson] standing outside and holding what appeared to be a marijuana cigarette," "exited their vehicle, approached Watson," "observed a heavy-looking L-shaped object in a fanny pack that Watson was wearing," "reached to feel the object through the fanny pack," and then "arrested Watson for Possession of a Firearm." Compl. ¶¶ 5(b)-(d). It is anyone's guess how, in this sequence of events, the officers first started to reasonably suspect that the cigar contained marijuana. The body camera footage, too, is useless since the footage begins after the Terry stop had been initiated.[5] And Watson's declaration, which the Government has agreed to accept as true for the purposes of this

---

[5]    The defense takes note of, but does not seek any specific relief with respect to, the fact that the body camera footage only begins after the stop and, even then, does not record sound for roughly thirty seconds.

motion, see Gov. Mem. at 2, is also unclear as to this question. The declaration simply states: "Upon exiting the van, the [officers] rushed at me. They yelled at me to 'stop'." Watson Decl. ¶ 4.

It is for this reason that, notwithstanding the Government's assumption that "every fact necessary to decide this motion is clear," Gov. Mem. at 2 n.1, the Court convened an evidentiary hearing. As the Court explained, the need for the evidentiary hearing "related entirely . . . to the circumstances surrounding the initial stop." Tr. 21:6-9.

At the evidentiary hearing, the Government called two of the three arresting officers: Officers Jorge Rodriguez and Edwin Garcia.[6] In addition, the Court admitted various exhibits, including videotaped footage from body cameras worn by the officers involved in the incident.[7] The Court finds that the officers testified credibly and, based on their testimony and the exhibits admitted into evidence, makes the following findings of fact.

---

[6]   The third officer, Officer Jose Leon, was available to testify, but neither party called him to do so. See Tr. 51:25-52:9.

[7]   The body camera footage of Officer Rodriguez was admitted at the hearing as Government Exhibit 3, see Tr. 8:11, and the body camera footage of Officer Garcia was admitted as Government Exhibit 5, see Tr. 48:1. The body camera footage was also submitted to the Court as Exhibit 1 to Dkt. No. 17, but it is not available through the public docket.

On the afternoon of the arrest, Officer Garcia was driving the van and Officer Rodriguez was in the passenger seat. Tr. 5:2-3, 26:3-4. The van was moving at "approximately 5 miles per hour" when the officers saw Watson standing across the street from about 30 feet away. Tr. 15:24-25, 50:5-6. From that distance, the officers believed that Watson was "holding a marijuana cigarette in his hand." Tr. 16:8-9, 39:23-40:1. While the officers could not smell the marijuana from the van, Tr. 35:14-17, they believed that the cigar contained marijuana from "the way it is wrapped," Tr. 35:21-36:2, and "packaged," Tr. 5:22-23-4. See also Tr. 37:7-10 (describing the cigar as a "very sloppy job."). Unlike tobacco cigars, which are "a little more tighter [sic] on the top," the cigar in Watson's hand appeared to Officer Rodriguez to be "funnel shape[d]." Tr. 35:21-36:4. Likewise, Officer Garcia believed the cigar contained marijuana because "it was too big to be a cigar," "it looked like a wrapped brown paper wrapping a marijuana cigarette inside," and "it wasn't white to be a cigarette." Tr. 41:14-22. It was the officers' belief that the cigar contained marijuana that led them to exit the van and approach Watson. See Tr. 35:18-20 (Rodriguez); Tr. 40:8-12 (Garcia).[8]

---

[8]    Both officers also testified that they received training to identify marijuana, Tr. 12:23-13:3 (Rodriguez); Tr. 44:14-18 (Garcia), and that in their five or six years as police officers,

The Court pauses here to note that, if this were the only the basis for the stop -- an across-the-street glimpse from a moving vehicle of an odd-looking cigar -- the Court might well have concluded that the officers lacked reasonable suspicion that the cigar contained marijuana. But the officers did not seize Watson immediately upon exiting the van; they seized him, as discussed, only once they directed him to "stop." The Court must therefore consider not only the facts that were known to the officers while they were in their van, but also the facts that became known to them after they exited the van but before they seized Watson.[9]

As the officers approached Watson -- and before directing him to stop -- Officer Garcia started to smell marijuana. Tr. 43:20-25. This testimony is corroborated by Officer Rodriguez's recollection that, while he does not recall exactly how far he was from Watson when he ordered him to stop, he was "pretty close." Tr. 29:4-5. It is further corroborated by the testimony of Officer

they had observed "hundreds" of individuals smoking marijuana, Tr. 12:18-22 (Rodriguez); Tr. 38:10-11, 44:9-13 (Garcia).

[9]     This is so even though, as Officer Garcia conceded, the officers had made the determination to stop Watson before exiting the van. Tr. 44:3-6. The question is not whether the officers had reasonable suspicion when they decided to make the stop; it is whether they had reasonable suspicion when they executed the stop. Cf. Wren v. United States, 517 U.S. 806, 813 (holding that an officer's "[s]ubjective intentions play no role in . . . Fourth Amendment analysis").

Rodriguez that, although a lit marijuana cigar might emit a stronger smell, "you can also smell one that is not lit." Tr. 13:18-21.

The Court finds that -- at the moment the officers directed Watson to "stop" -- they had reasonable suspicion to believe that the cigar contained marijuana. This reasonable suspicion is based on the fact that, while standing "pretty close" to Watson, the officers, already suspicious about the shape and wrapping of the cigar, began to detect the smell of marijuana.[10]

### B. Whether, before Frisking Watson, the Terry Stop became a de facto arrest.

While reasonable suspicion can support a Terry stop, it cannot form the basis of an arrest, which requires nothing less than probable cause. See Grice v. McVeigh, 873 F.3d 162, 167 (2d Cir. 2017). For that reason, a Terry stop must be "limited to the degree of intrusion necessary to confirm or dispel the reasonable

---

[10]   The Court recognizes that the officers here had a less compelling basis for the stop than the officer in Bignon, who observed, among other things, the lit cigar's distinctive plume, the defendant's peculiar manner of holding the cigar, and the defendant's suspicious reaction upon seeing the officers approach. 813 Fed. App'x at 37. But the Second Circuit in that case held that the officers had not just reasonable suspicion to conduct a Terry stop, but probable cause to make an arrest. Reasonable suspicion, of course, "constitutes a less stringent standard than probable cause." United States v. Lifshitz, 369 F.3d 173, 188 (2d Cir. 2004). While the officers here may have initially lacked probable cause to arrest Watson for possession of marijuana, they had reasonable suspicion to conduct the Terry stop on that basis.

suspicion that justifies the stop in the first place." Id. Watson argues that even if the officers had reasonable suspicion to make a Terry stop, the stop was so intrusive that it ripened into a de facto arrest before the officers discovered the firearm and formally arrested him. Joyce Affirm at ¶ 15.

To determine whether a Terry stop is so intrusive as to ripen into a de facto arrest, courts look to:

> the amount of force used by police, the need for such force, and the extent to which the individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or not handcuffs were used.

Grice, 873 F.3d at 167. In support of his argument that he was subjected to a de facto arrest, Watson points to the following features of the stop: (1) he "was not permitted to leave"; (2) he "was yelled at to stop by the [officers] exiting a van and running up to him"; and (3) "[t]hree agents approached him on the sidewalk and all three surrounded him." Joyce Affirm at ¶ 15.

The Court holds that Watson was not subjected to a de facto arrest. Indeed, nearly all of the relevant factors cut against such a finding. The officers did not use force, or even touch Watson, until they frisked him and found the firearm. Tr. 20:6-9 ("Q: Prior to the time when you grabbed the fanny pack, had you Officer Leon, or Officer Garcia physically restrained Mr. Watson?

-14-

A. No."). Notably, the officers did not handcuff Watson until they formally arrested him upon discovering the firearm. See Grice, 873 F.3d at 167 ("Handcuffing is ordinarily not incident to a Terry stop, and tends to show that a stop has ripened into an arrest.") And, at most, only a few minutes elapsed between the initial stop and the frisk. See Tr. 20:13-15 (Officer Rodriguez testifying that he had been talking to Watson for only 10 seconds before grabbing the fanny pack). That the Second Circuit has declined to find a de facto arrest in far lengthier and more force-filled police interactions, see, e.g., Grice, 873 F.3d at 168 (no de facto arrest where the defendant was handcuffed for 33 minutes), provides more support still that Watson was not subjected to one here.

## C. Whether, upon stopping Watson, the Officers had Reasonable Suspicion to Frisk Him

That the officers had reasonable suspicion to stop Watson does not mean that they were necessarily entitled to frisk him. To justify frisk under the second Terry prong, the officers must have had reasonable suspicion that Watson was "armed and presently dangerous." Terry, 392 U.S. at 30. The Government contends that the officers had the requisite reasonable suspicion on the basis of their observation, made during the Terry stop, of the "heavy-looking L-shaped object" in Watson's fanny pack, which, based on

their "training and experience," the officers recognized as "likely a firearm." Compl. ¶ 5(c); Tr. 14:14-23.

Whether a "bulge" is enough to provide reasonable suspicion that someone is "armed and dangerous" is a fact-driven inquiry. In Pennsylvania v. Mimms, 434 U.S. 106, 112 (1977), for example, the Supreme Court held that a "large bulge under [the defendant's] sports jacket . . . permitted [an] officer to conclude that [the defendant] was armed and thus posed a serious and present danger to the safety of the officer." But not every "bulge" can justify a frisk. See, e.g., Floyd v. City of New York, 959 F. Supp. 2d 540, 614 (S.D.N.Y. 2013)("[T]he outline of a commonly carried object such as a wallet or cell phone does not justify a . . . frisk."); People v. Stevenson, 7 A.D.3d 820, 820 (2d Dep't 2004) (finding no justification for a frisk where "[t]he detective did not indicate that the bulge had the outline of a weapon, and he was unable to describe it in any further detail"). Where, however, the "bulge" presents the "classic 'L-shape' typical of larger guns," courts will typically approve an officer's investigatory frisk. See United States v. Price, No. 13-cr-216 (RRM), 2014 WL 558674, at *9 (E.D.N.Y. Feb. 11, 2014) (collecting cases).

The Court holds that the officers had reasonable suspicion to frisk Watson. The Court finds that the bulge that the officers observed in Watson's fanny pack was not a generic bulge, but a

-16-

"heavy-looking L-shaped object." Compl. ¶ 5(c); Tr. 45:13-16 (Officer Rodriguez testifying that, after stopping Watson, he "noticed the fanny pack around his waist and . . . noted a heavy object weighing down on him which resembled the outline of a firearm in it"). This observation entitled the officers to conduct a Terry frisk of the fanny pack.

In urging the Court away from this conclusion, Watson relies on United States v. Weaver, 975 F.3d 94 (2d Cir. 2020). In Weaver, the Second Circuit explained that an officer's reasonable suspicion that the defendant is "hiding something" cannot support a frisk unless there are "specific or articulable facts that [the defendant] was hiding something dangerous." Id. at 103. For that reason, the panel held that an officer's frisk was unconstitutional where it was supported only by his observation that the defendant, who was sitting in the passenger seat of a car, "was squirming and trying to push something down," since the defendant's "actions were equally consistent with the act of secreting drugs or other nonhazardous contraband." Id. Watson argues that, like in Weaver, the officers here lacked an articulable basis to believe that Watson was hiding something dangerous. Joyce Affirm. ¶ 17.

Weaver is of little help to Watson. For present purposes, that case stands for the unremarkable proposition that not all evasive movements, like not all bulges, provide reasonable

-17-

suspicion that a person is armed and dangerous. For the reasons already discussed, however, the officers' observation of an L-shaped bulge gave them reasonable suspicion that Watson was armed and dangerous, and therefore properly subject to a frisk.

## II.   Whether, upon frisking Watson, the Officers Were Entitled to Open the Fanny Pack Pursuant to the Plain Feel Doctrine

Finally, Watson argues that because the officers gained complete control of the fanny pack after removing it from Watson's body, they were required to obtain a search warrant before opening it. Joyce Affirm. ¶ 20. The Government responds that the officers were entitled to open the fanny pack without a warrant under the so-called "plain feel doctrine." Gov. Mem. at 6.[11]

---

[11]   The Government also argues that, even if the warrantless search of the fanny pack were improper, the firearm would still be admissible under the inevitable discovery doctrine since the police would have "inevitably discovered the firearm through an inventory search when they processed Watson after his arrest. Gov. Mem. at 15. In order for the possibility of an inventory search to trigger the inevitable discovery doctrine, however, the Court must find that the evidence would "have been discovered in the course of a valid inventory search conducted pursuant to standardized, established procedures. United States v. Mendez, 315 F.3d 132, 138 (2d Cir. 2002) (emphasis added); see also United States v. Griffith, 47 F.3d 74, 78 (2d Cir. 1995) ("Particularly when closed containers are involved, the police are required to have an established policy regarding the containers, so that the inventory does not become a ruse for a general rummaging in order to discover incriminating evidence."). Because the record in this case contains no information regarding such a policy, the Court will not reach the issue.

The plain feel doctrine, a variation on the plain view doctrine, provides that law enforcement officers may seize evidence discovered through the sense of touch during a lawful Terry frisk. See Minnesota v. Dickerson, 508 U.S. 366, 375 (1993). "The plain feel doctrine applies to the seizure of objects in containers as well as objects found on the person of a suspect." United States v. Colon, No. 10-cr-498 (RPP), 2011 WL 569874, at *13 (S.D.N.Y. Feb. 8, 2011) (citing United States v. Ocampo, 650 F.2d 421, 429 (2d Cir. 1981)). By contrast, where the nature of the object is not immediately apparent by touch, law enforcement officers are prohibited from "physical manipulation," such as "feel[ing] the bag in an exploratory manner." Bond v. United States, 529 U.S. 334, 338-39 (2000). Thus, if, at the moment a container is properly seized, the contraband is "perceptible by . . . touch," the contraband itself "could be seized as in plain view." United States v. Diaz, 577 F.2d 821, 824 (2d Cir. 1978); see also Ocampo, 650 F.2d at 429 ("Where the contents of a container are easily discernible by frisking the exterior of a package . . . it would be a pointless formality to require that the agents first obtain a warrant . . . .").

The Court holds that Officer Rodriguez was entitled to seize and search the fanny pack pursuant to the plain feel doctrine. The Complaint alleges that Officer Rodriguez, upon frisking the fanny

-19-

pack, "immediately confirmed that it was a firearm." Compl. ¶ 5(d).
His testimony corroborated the same. For example, he testified
that, upon frisking the fanny back, he "instantly" "felt a very
hard object which [he] knew to be a firearm" based on his
"experience with gun arrests" and from the fact that he himself
often carried a weapon. Tr. 17:19-25, 18:3. Accordingly, Officer
Rodriguez was entitled to seize the fanny pack (pursuant to
Dickerson) and search it (pursuant to Ocampo).

## Conclusion

For the foregoing reasons, the Court, by Order dated January
26, 2021, denied Watson's motion to suppress. Counsel are reminded
that trial in this case will proceed on March 29, 2021 at 9:30
a.m. in Courtroom 14B of the Daniel Patrick Moynihan Courthouse.

SO ORDERED.

Dated:   New York, NY
         February 11, 2021              JED S. RAKOFF, U.S.D.J.

-20-